MARCUS BLACKWELL *v.* TULLAT MAHMOOD ET AL.
(AC 30831)

DiPentima, Robinson and Alvord, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 21—officially released April 27, 2010

*Sydney T. Schulman,* with whom was *Alina Bricklin-Goldstein,* for the appellants (defendants).

*Brennen C. Maki,* with whom, on the brief, was *James F. Murtha,* certified legal intern, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, J. The defendants Tullat Mahmood and Two Hundred Eighty Broad Elm, LLC,[1] appeal from the judgment in favor of the plaintiff, Marcus Blackwell, for breach of contract, statutory theft, conversion, bad faith and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et

[1] Mahmood is the sole owner of Two Hundred Eighty Broad Elm, LLC. The action was withdrawn as against a third defendant, First Rate Capital Corporation. We therefore refer in this opinion to Mahmood and Two Hundred Eighty Broad Elm, LLC, as the defendants.

seq. On appeal, the defendants claim that the court improperly (1) found that they were estopped from enforcing a mortgage contingency clause and that the plaintiff was entitled to the return of his deposit, (2) awarded treble damages for statutory theft pursuant to General Statutes § 52-564 and (3) awarded damages pursuant to CUTPA.[2] We disagree and, accordingly, affirm the judgment of the trial court.

The court found the following facts in its memorandum of decision. On or about September 20, 2005, the plaintiff and Mahmood entered into a written agreement for Mahmood to sell to the plaintiff properties at 280-292 Broad Street and 19 Elm Street in Windsor for a purchase price of $1.8 million. The agreement provided that a deposit of $40,000 be paid by the plaintiff.

The agreement contained a mortgage contingency clause under which the plaintiff was to obtain a mortgage loan in an amount of not less than $1,440,000 at prevailing interest rates. The mortgage contingency clause also stated that if the plaintiff could not obtain a written commitment for a mortgage loan within thirty days, he "shall immediately notify [the defendants] and provide [the defendants] with a copy of [his] mortgage loan denial letter," and that the plaintiff may terminate the agreement and have his deposit returned by giving written notice to the defendants "on or before the expiration of such thirty day period . . . ." The clause further provided that if the plaintiff did not give written notice within the thirty day period, he would forfeit his deposit. The appraisal ordered by the bank set a value, as of December 8, 2005, of $1,220,000. Mahmood admitted at trial that he gave the plaintiff one oral and two written extensions of time as to the thirty days provided

---

[2] The defendants also present a claim that "the plaintiff was not injured by a technical breach of the escrow agreement." This claim focuses on extraneous factual findings that are not integral to the judgment of the trial court. For this reason, we will not review this claim any further.

for in the mortgage contingency clause. In late January, 2006, the parties determined that they could not negotiate an alternative agreement. In a letter dated February 8, 2006, the plaintiff asked for the return of his deposit. Mahmood refused to return the $40,000 deposit to the plaintiff.

By revised complaint filed December 15, 2006, the plaintiff brought suit against the defendants The defendants filed an answer and special defenses.

Following a trial before the court, judgment was rendered in favor of the plaintiff on counts one, four, five, six and seven of the revised complaint and in favor of the plaintiff on the first special defense. The court awarded the plaintiff damages totaling $136,930.41, which included $10,000 in punitive damages, $12,000 in interest and $34,930.41 in attorney's fees pursuant to CUTPA. This appeal followed.[3]

I

The defendants first claim that the court improperly found that they were estopped from enforcing the mortgage contingency clause and that the plaintiff was entitled to the return of his deposit. More specifically, the defendants argue that the plaintiff failed to fulfill the requirement to provide written notice to request the return of his deposit within the requisite time period and that he therefore forfeited his deposit by the terms of the contract. The plaintiff claims that the court properly found that the defendants were estopped from enforcing the mortgage contingency clause through Mahmood's actions, including agreeing to a mortgage

---

[3] After the defendants filed this appeal, the trial court issued an "amendment" to its judgment in order to award the plaintiff additional attorney's fees and offer of judgment interest, and to correct a mathematical error in its damages award. The total judgment as of March 24, 2009, was $190,387.07. On July 23, 2009, the court held a hearing and awarded additional attorney's fees in the amount of $11,208 to the plaintiff.

appraisal of the property outside of the deadline and holding meetings in December, 2005, and January, 2006, with the plaintiff regarding negotiations in light of the low appraisal. We agree that there was sufficient evidence for the court to find that the defendants were estopped from enforcing the mortgage contingency clause.

We first set forth the standard of review. The defendants assert that this issue is one of law, because it involves the interpretation of a written contract, and that the standard of review should therefore be plenary. In fact, the defendants stated at oral argument to this court that they do not challenge any of the court's factual findings on appeal and that the issue they raise is the application of those facts to the relevant legal principles. The central issue of the defendants' claim, however, is based on the court's finding that the defendants are estopped from enforcing the mortgage contingency clause as it was originally written. "The party claiming estoppel . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case. . . . Accordingly, we will reverse the trial court's legal conclusions regarding estoppel only if they involve an erroneous application of the law." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 614, 830 A.2d 164 (2003).

The doctrine of equitable estoppel is well established. "[W]here one, by his words or actions, intentionally

causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is [precluded] from averring a different state of things as existing at the time." (Internal quotation marks omitted.) *Johnnycake Mountain Associates* v. *Ochs*, 104 Conn. App. 194, 208, 932 A.2d 472 (2007), cert. denied, 286 Conn. 906, 944 A.2d 978 (2008); see also *Cowles* v. *Bacon*, 21 Conn. 451, 467 (1852). "Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct. . . . In its general application, we have recognized that [t]here are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . [Our courts] previously [have] applied the doctrine of equitable estoppel to bar a party from asserting the statute of frauds as a defense so as to prevent the use of the statute itself from accomplishing a fraud. . . .

"When estoppel is applied to bar a party from asserting the statute of frauds, however, we also require that the party seeking to avoid the statute must demonstrate acts that constitute part performance of the contract. . . . Specifically, [t]he acts of part performance . . . must be such as are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties. . . . The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the

existence of some contract in relation to the subject matter in dispute. . . . In the context of the statute of frauds, therefore, we sometimes have referred to the application of estoppel as the doctrine of part performance . . . .

"[A]lthough [our courts] on occasion [have] used the terms interchangeably, we never have intended that the doctrine of equitable estoppel and the doctrine of part performance operate as independent exceptions to the statute of frauds. . . . Rather, part performance is an essential element of the estoppel exception to the statute of frauds. . . .

"Indeed, our review of cases since the [mid-1800s] reveals no instance in which this court has concluded that a party was estopped from asserting the statute of frauds without evidence of part performance. We recognize that some other jurisdictions apply the doctrine of equitable estoppel even in the absence of part performance or when evidence of part performance may be insufficient. . . . In our view, however, this approach is unwise when an independent cause of action or other remedial measures may be available to address such conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 60–65, 873 A.2d 929 (2005).

"Thus, in sum, the elements required for part performance are: (1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract. . . . Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. . . . First, part performance satisfies the evidentiary function of the statute of frauds by providing proof of the contract itself. . . . Second, the inducement of reliance on the

oral agreement implicates the equitable principle underlying estoppel because repudiation of the contract by the other party would amount to the perpetration of a fraud." (Citations omitted; internal quotation marks omitted.) Id., 62–63.

The defendants maintain that the plaintiff did not cancel the agreement pursuant to the mortgage contingency clause, but rather that he breached the agreement through his failure to request the return of his deposit in written form within the time period set out in the original contract. The defendants also claim that because the original agreement falls within the statute of frauds, as it is a contract for the purchase and sale of real estate, any modification of the agreement must be in writing to be valid. "The statute of frauds requires that the essential terms and not every term of a contract be set forth therein. . . . The essential provisions of a contract are the purchase price, the parties, and the subject matter for sale. . . . In order to be in compliance with the statute of frauds, therefore, an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof . . . . The statute of frauds is also satisfied [when] the contract or memorandum contains by reference some other writing or thing certain." (Citations omitted; internal quotation marks omitted.) *SS-II* v. *Bridge Street Associates*, 293 Conn. 287, 294, 977 A.2d 189 (2009).

The following findings of fact were set out by the court in its memorandum of decision and are relevant to our disposition of this issue. "Mahmood admitted in testimony that he gave extensions of time, some in writing and some orally, to the plaintiff regarding the mortgage contingency. Mahmood claims that the reason he did not turn over the $40,000 was because he did not receive written notification of [the plaintiff's] inability to get a proper mortgage, that it should have been

given within thirty days of being notified that he would not be able to get the mortgage. All parties were waiting for the appraisal to be done. . . . The appraisal was completed on December 8, 2005 . . . and the plaintiff became aware of it on or about December 12, 2005, knowing from said appraisal that he would not be able to get the mortgage required. Mahmood gave him until the end of December to see what he could do about still obtaining the mortgage. When [the plaintiff] approached [Mahmood] at the end of December to discuss where the parties should go from there to see if the deal could still be resurrected, he did not notify Mahmood in writing at that time because, [as] Mahmood testified, he told [the plaintiff] that he was leaving for Pakistan, and they would talk about it when he got back. Mahmood returned at the end of January, 2006, and when the parties talked and realized they could not come to an . . . alternate agreement, it only then became clear that [the plaintiff] could not resurrect the contract. He then went to his attorney . . . who sent a letter . . . to Mahmood seeking a return of the $40,000 [dated February 8, 2006]. . . . Because Mahmood gave extensions right up to and including December 31, 2005, regarding notification of the mortgage contingency and putting off further discussion until he returned from Pakistan at the end of January, 2006, and [the plaintiff] obviously relied on Mahmood's extensions up to and including . . . when Mahmood returned from Pakistan, Mahmood is, therefore, estopped from claiming that the thirty days began to run at the end of December, 2005."

Mahmood testified that he had agreed, in writing, to two additional extensions of the mortgage contingency clause and that he had orally agreed with the plaintiff to wait for an additional appraisal to be completed. Also, as the court noted, there was no "time is of the

essence" clause present in the written contract.[4] Based on the testimony of the plaintiff, the court also found that Mahmood went on an extended trip to Pakistan after orally agreeing to the extension of time and led the plaintiff to believe that they could continue to discuss the terms of the sale upon his return. The court determined that these actions—the plaintiff's moving ahead with the appraisal of the property and his meetings with Mahmood—constituted the part performance necessary to overcome the statute of frauds regarding the mortgage contingency clause. The plaintiff relied, to his detriment, on Mahmood's statements and actions, and in agreeing to discuss the matter further in January, when Mahmood planned to return from his trip, he made it clear to Mahmood that he wanted to negotiate further. Therefore, we conclude that the court's determination that Mahmood was estopped from enforcing the mortgage contingency clause was not clearly erroneous.

## II

The defendants next claim that the court improperly awarded treble damages for statutory theft pursuant to § 52-564. More specifically, the defendants claim that because the plaintiff's original payment of the deposit was voluntary and they were acting under an honestly held claim of right, they did not have the necessary larcenous intent to sustain a judgment against them on a count of statutory theft. We do not agree.

---

[4] "When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party. . . . Its commonly understood meaning is that insofar as a time for performance is specified in the contract, failure to comply with the time requirement will be considered to be a material breach of the agreement." (Citations omitted; internal quotation marks omitted.) *Banks Building Co., LLC* v. *Malanga Family Real Estate Holding, LLC*, 102 Conn. App. 231, 238, 926 A.2d 1 (2007).

Section 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119." (Internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 771, 905 A.2d 623 (2006). "A person commits larceny within the meaning of . . . § 53a-119 when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. An 'owner' is defined, for purposes of § 53a-119, as any person who has a right to possession superior to that of a taker, obtainer or withholder. General Statutes § 53a-118 (a) (5)." *Mystic Color Lab, Inc.* v. *Auctions Worldwide, LLC*, 284 Conn. 408, 418–19 n.14, 934 A.2d 227 (2007).

We note that the plaintiff's burden to prove statutory theft pursuant to § 52-564 was by clear and convincing evidence. See *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520, 705 A.2d 215 (1998) ("[t]he trial court properly recognized that the plaintiff was required to satisfy the higher standard of proof by clear and convincing evidence to be entitled to an award of treble damages pursuant to § 52-564"). "Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is

not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *Chernick* v. *Johnston*, 100 Conn. App. 276, 280, 917 A.2d 1042, cert. denied, 282 Conn. 919, 925 A.2d 1101 (2007).

The defendants direct us to *Lawson* v. *Whitey's Frame Shop*, 42 Conn. App. 599, 682 A.2d 1016 (1996), rev'd on other grounds, 241 Conn. 678, 697 A.2d 1137 (1997), for an explanation of the intent necessary to maintain a larceny charge and ask us to apply the same reasoning to the claim for statutory theft. In *Lawson*, the defendants, acting under a contract with the city of Hartford, sold the plaintiffs' automobiles while the plaintiffs were still contesting parking tickets allegedly owed to Hartford. This court held that the award of treble damages under § 52-564 was plain error because "the defendant was acting under an honestly held claim of right." Id., 606. The defendants claim that the reasoning in *Lawson* applies here because Mahmood was acting under the terms of the original written contract as he understood them, and, therefore, acting under a claim of right. We do not agree.

This case is distinguishable from *Lawson* because in that case the trial court made a clear finding in its memorandum of decision that the defendant was acting under an "honestly held claim of right." (Internal quotation marks omitted.) Id. In the present case, the court found in its memorandum of decision that "[i]t is more

likely that Mahmood refused to return the $40,000 deposit because, as he stated on cross-examination, there were many instances in which he did not get a return of deposit. The claim that his attorney told him that he could keep the deposit is not supported by any evidence including testimony from his attorney." The court also stated that "Mahmood was not credible during this trial and in various documents that are either part of the file or are exhibits in this case," noting that "[i]n cross-examination . . . he made statements that contradicted several of the statements he made in his earlier deposition." All in all, the court did not make any findings that Mahmood was acting under an "honestly held claim of right." *Lawson* v. *Whitey's Frame Shop*, supra, 42 Conn. App. 606. In fact, the court made several findings characterizing Mahmood's actions and representations during the relevant time period as dishonest.

We conclude, therefore, that the evidence presented was sufficient to establish a statutory theft in that the money held by the defendants belonged to the plaintiff and that Mahmood intentionally withheld the funds from the plaintiff. Thus, the court's award of treble damages to the plaintiff pursuant to § 52-564 was not clearly erroneous.

III

Finally, the defendants claim that the court improperly found that they had violated CUTPA. More specifically, the defendants claim that they could not have violated CUTPA because they were relying on a contractually bargained for right based on their interpretation of the written contract. We do not agree.

We begin by setting forth the applicable standard of review. "To the extent that the defendant is challenging the trial court's interpretation of CUTPA, our review is

plenary. . . . [W]e review the trial court's factual findings under a clearly erroneous standard. . . . Appellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . As to the damages awarded to the plaintiff, [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 483, 871 A.2d 981 (2005); *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 656, 850 A.2d 145 (2004); see also *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 90, 752 A.2d 1037 (1999) (applying abuse of discretion standard to punitive damages award).

Section 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice violates CUTPA, we are guided by the criteria set out in the Federal Trade Commission's so-called cigarette rule: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 155, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). "All three criteria do not need to be satisfied

to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) Id.

In its memorandum of decision, the court found: "(1) the deliberate withholding of the $40,000 by the [defendants] . . . was an unwarranted refusal to return the $40,000 that offends public policy as it has been established by statute, by the common law by the established concept that wrongfully withholding money that was due knowing that it was due amounts to unfairness; (2) deliberately withholding the $40,000 deposit when the [defendants] . . . knew that the $40,000 should have been paid to [the plaintiff] is immoral, unethical and unscrupulous; (3) this wrongful withholding of the $40,000 caused substantial injury to the plaintiff . . . who is in the category of either consumers or other businessmen; [and] (4) the injury to the plaintiff also satisfies [the three criteria of the cigarette rule]. It is substantial . . . it is clearly not outweighed by any countervailing benefits to consumers or competition that the practice produces, and it is not an injury the plaintiff could reasonably have avoided." These factual findings are fairly based on the evidence, not challenged on appeal and sufficient to establish a violation of CUTPA. Thus, we conclude that the court properly awarded damages pursuant to CUTPA.

The judgment is affirmed.

In this opinion the other judges concurred.